## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
## SOUTHERN DIVISION

LISA DARSHELLE BREWER,

     *Plaintiff*,

*v.*                   CASE NO. 2:13-CV-14409

CAROLYN W. COLVIN         DISTRICT JUDGE SEAN F. COX
Commissioner of Social Security,    MAGISTRATE JUDGE PATRICIA T. MORRIS

     *Defendant*.

_____/

### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION[1]

## I.    RECOMMENDATION

In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Plaintiff is not disabled. Accordingly, **IT IS RECOMMENDED** that Plaintiff's Motion for Summary Judgment be **DENIED** and that Defendant's Motion for Summary Judgment be **GRANTED**.

## II.    REPORT

### A.    Introduction and Procedural History

Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to this magistrate judge for the purpose of reviewing the Commissioner's decision denying Plaintiff's claim for Supplemental Security Income ("SSI")

---

[1]The format and style of this Report and Recommendation are intended to comply with the requirements of the E-Government Act of 2002, Pub. L. 107-347, 116 Stat. 2899 (Dec. 17, 2002), Fed. R. Civ. P. 5.2(c)(2)(B), E.D. Mich. Administrative Order 07-AO-030, and guidance promulgated by the Administrative Office of the United States Courts found at: http://www.uscourts.gov/RulesAndPolicies/JudiciaryPrivacyPolicy/March2008RevisedPolicy.aspx. This Report and Recommendation only addresses the matters at issue in this case and is not intended for publication in an official reporter or to serve as precedent.

under Title XVI, 42 U.S.C. § 1381 *et seq.*. This matter is currently before the Court on cross-motions for summary judgment. (Docs. 9, 11.)

Plaintiff Lisa Darshelle Brewer was forty-seven years old during the administrative hearing. (Transcript, Doc. 7 at 47.) Plaintiff's work history includes jobs as a cashier, "chore provider," and janitor. (Tr. at 142.) On May 13, 2010, Plaintiff filed the present claim for SSI, alleging that she became unable to work on September 1, 2008. (Tr. at 111.)

The claim was denied at the initial administrative stage. (Tr. at 70.) In denying the claim, the Commissioner considered affective disorders and asthma. (*Id.*) On August 30, 2011, Plaintiff appeared before Administrative Law Judge ("ALJ") Kathleen H. Eiler, who considered the application for benefits de novo. (Tr. at 45-62.) In her decision issued the next month, on August 23, 2011, the ALJ found that Plaintiff was not disabled. (Tr. at 29, 39.) Plaintiff requested a review of this decision on October 10, 2011. (Tr. at 24-25.)

The ALJ's decision became the Commissioner's final decision, *see Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 543-44 (6th Cir. 2004), on August 15, 2013, when, after review of additional exhibits[2] (Tr. at 424-86,) the Appeals Council denied Plaintiff's request for review. (Tr. at 1-6.) On October 18, 2013, Plaintiff filed the instant suit seeking judicial review of the Commissioner's unfavorable decision. (Pl.'s Compl., Doc. 1.)

---

[2]In this circuit, where the Appeals Council considers additional evidence but denies a request to review the ALJ's decision, since it has been held that the record is closed at the administrative law judge level, those "AC" exhibits submitted to the Appeals Council are not part of the record for purposes of judicial review. *See Cline v. Comm'r of Soc. Sec.*, 96 F.3d 146, 148 (6th Cir. 1996); *Cotton v. Sullivan*, 2 F.3d 692, 696 (6th Cir. 1993). Therefore, since district court review of the administrative record is limited to the ALJ's decision, which is the final decision of the Commissioner, the court can consider only that evidence presented to the ALJ. In other words, Appeals Council evidence may not be considered for the purpose of substantial evidence review.

**B.     Standard of Review**

The Social Security system has a two-tiered structure in which the administrative agency handles claims and the judiciary merely reviews the factual determinations to ensure they are supported by substantial evidence. 42 U.S.C. § 405(g); *Richardson v. Perales*, 402 U.S. 389, 390 (1971). The administrative process provides multiple opportunities for reviewing the state agency's initial determination. The Plaintiff can first appeal the decision to the Social Security Agency, then to an ALJ, and finally to the Appeals Council. *Bowen v. Yuckert*, 482 U.S. 137, 142 (1987). Once this administrative process is complete, an unsuccessful claimant may file an action in federal district court. *Sullivan v. Zebley*, 493 U.S. 521, 524-28 (1990), *superseded by statute on other grounds*, Personal Responsibility and Work Opportunity Reconciliation Act of 1996, Pub. L. No. 104-193, 110 Stat. 2105; *Mullen v. Bowen*, 800 F.2d 535, 537 (6th Cir. 1986) (en banc).

This Court has original jurisdiction under 42 U.S.C. § 405(g) to review the Commissioner's final administrative decision. The statute limits the scope of judicial review, requiring the Court to "'affirm the Commissioner's conclusions absent a determination that the Commissioner has failed to apply the correct legal standards or has made findings of fact unsupported by substantial evidence in the record.'" *Longworth v. Comm'r of Soc. Sec.*, 402 F.3d 591, 595 (6th Cir. 2005) (quoting *Warner v. Comm'r of Soc. Sec.*, 375 F.3d 387, 390 (6th Cir. 2004)). *See also Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 528 (6th Cir. 1997). The court's review of the decision for substantial evidence does not permit it to "'try the case *de novo*, resolve conflicts in evidence, or decide questions of credibility.'" *Ulman v. Comm'r of Soc. Sec.*, 693 F.3d 709, 713 (6th Cir. 2012) (quoting *Bass v. McMahon*, 499 F.3d 506, 509 (6th Cir. 2007)). *See also Garner v. Heckler*, 745 F.2d 383, 387 (6th Cir. 1984).

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 247 (6th Cir. 2007). *See also Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 542 (6th Cir. 2007) (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 475 (6th Cir. 2003) ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

The Commissioner's findings of fact are conclusive if supported by substantial evidence. 42 U.S.C. § 405(g). Therefore, a court may not reverse the Commissioner's decision merely because it disagrees or because "'there exists in the record substantial evidence to support a different conclusion.'" *McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006) (quoting *Buxton v. Halter*, 246 F.3d 762, 772 (6th Cir. 2001)). *See also Mullen*, 800 F.2d at 545. The court can only review the record before the ALJ. *Bass*, 499 F.3d at 512-13; *Foster v. Halter*, 279 F.3d 348, 357 (6th Cir. 2001). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). *See also Jones*, 336 F.3d at 475. "[T]he . . . standard is met if a 'reasonable mind

might accept the relevant evidence as adequate to support a conclusion.'" *Longworth*, 402 F.3d at 595 (quoting *Warner*, 375 F.3d at 390). "The substantial evidence standard presupposes that there is a '"zone of choice"' within which the Commissioner may proceed without interference from the courts." *Felisky v. Bowen*, 35 F.3d 1027, 1035 (6th Cir. 1994) (citations omitted) (quoting *Mullen*, 800 F.2d at 545).

A court's review of the Commissioner's factual findings for substantial evidence must consider the evidence in the record as a whole, including that evidence which might subtract from its weight. *Wyatt v. Sec'y of Health & Human Servs.*, 974 F.2d 680, 683 (6th Cir. 1992). "Both the court of appeals and the district court may look to any evidence in the record, regardless of whether it has been cited by the Appeals Council." *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001). There is no requirement, however, that either the ALJ or the reviewing court discuss every piece of evidence in the administrative record. *Van Der Maas v. Comm'r of Soc. Sec.*, 198 F. App'x 521, 526 (6th Cir. 2006); *Kornecky v. Comm'r of Soc. Sec.*, 167 F. App'x 496, 508 (6th Cir. 2006) ("'[A]n ALJ can consider all the evidence without directly addressing in his written decision every piece of evidence submitted by a party.'" (quoting *Loral Defense Systems-Akron v. N.L.R.B.*, 200 F.3d 436, 453 (6th Cir. 1999))).

## C.    Governing Law

"'The burden lies with the claimant to prove that she is disabled.'" *Ferguson v. Comm'r of Soc. Sec.*, 628 F.3d 269, 275 (6th Cir. 2010) (quoting *Foster*, 279 F.3d at 353). *Accord Boyes v. Sec'y of Health & Human Servs.*, 46 F.3d 510, 512 (6th Cir. 1994)). There are several benefits programs under the Act, including the DIB program of Title II, 42 U.S.C. §§ 401-434, and the Supplemental Security Income ("SSI") program of Title XVI, 42 U.S.C. §§ 1381-1385. Title II

benefits are available to qualifying wage earners who become disabled prior to the expiration of their insured status; Title XVI benefits are available to poverty-stricken adults and children who become disabled. F. Bloch, *Federal Disability Law and Practice* § 1.1 (1984). While the two programs have different eligibility requirements, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI).

The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.

> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.

> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.

> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston*, 245 F.3d at 534. "If the Commissioner makes a dispositive finding at any point in the five-step process, the review terminates." *Colvin*, 475 F.3d at 730.

"Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by her impairments and the fact that she is precluded from performing her past relevant work." *Jones*, 336 F.3d at 474. *See also Cruse*, 502 F.3d at 540. The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

### D.    ALJ Findings

The ALJ found at step one that Plaintiff had not engaged in substantial gainful activity since the application date.[3] (Tr. at 31.) At step two, the ALJ concluded that Plaintiff had the following severe impairments: "chronic back pain, hypertension, right shoulder disorder, asthma, depression, anxiety, and obesity. (*Id.*) At step three, the ALJ found that Plaintiff's combination of impairments did not meet or equal one of the listings in the regulations. (Tr. at 31-34.) At step four, the ALJ found that Plaintiff was unable to perform any past relevant work. (Tr. at 37.) The ALJ also found that Plaintiff was forty-six years old on the application date, putting her in the "younger individual age" category. (Tr. at 38.) *See* 20 C.F.R. §§ 404.1563, 416.963. At step five, the ALJ found that

---

[3] The ALJ wrote that Plaintiff applied on April 27, 2010, (Tr. at 31), but the application sheet shows she applied on May 13, 2010, (Tr. at 111).

Plaintiff could perform a limited range of light work in jobs existing in significant numbers in the regional economy. (Tr. 34-39.)

### E.   Administrative Record

The earliest medical data in the record is contained in a vital signs flow sheet submitted by the Community Health Center. (Tr. at 212.) The sheet marks various measurements from April 2005 until February 2008; in particular it tracked her pain level, presumably from one to ten, on a visual analog ("VA") scale. (*Id.*) Out of twenty recorded sessions, she rated her pain once at four, once at three, once at six, once at five, and once at three-and-one-half. (*Id.*) The recorder either failed to write the score during the other visits, or wrote, "θ." (*Id.*)

On October 18, 2007, Plaintiff went to the emergency room with "parasternal chest heaviness and fast heart rate." (Tr. at 198.) She was anxious, admitted to smoking, but denied difficulty breathing. (*Id.*) The physical examination revealed no potential causes, nor did the chest x-ray, which showed "no acute disease." (Tr. at 199, 204.) The electrocardiogram ("EKG") showed "frequent premature ventricular contractions, though she was "comfortable," and the examiner admitted her to the chest pain center. (*Id.*) There, Dr. Peter G. Fattal[4] noted Plaintiff had "no previous cardiovascular history," but had "in a setting of hypertension and tobacco abuse . . . developed acute onset of palpitations with shortness of breath and precordial chest pain." (Tr. at 200.) She denied syncope, fever, blurred vision, urinary difficulties, "exertional symptoms," or gastrointestinal symptoms. (*Id.*) Another physical examination was unremarkable. (Tr. at 200-01.)

Plaintiff then completed a stress test, which showed normal resting sinus rhythm. (Tr. at 202.) During her six minutes exercising, she "[a]chieved target heart rate, had no chest pain, [but]

---

[4] Michael Joley, a physician's assistant, dictated the notes, but Dr. Fattal was the listed attending physician and his name is at the bottom of the form, although he did not sign the sheets. (Tr. at 201.)

did have shortness of breath likely secondary to deconditioning." (*Id.*) Her "[b]lood pressure and heart rate rose appropriately with adequate exercise tolerance . . . ." (Tr. at 203.) Various scans displayed normal cardiac functioning, though she had "mild tricuspid regurgitation" and "[m]ild pulmonary hypertension." (*Id.*) "Overall," Dr. Jeffrey W. Carney concluded, "this looks to be a low probability stress echo. The patient can be discharged home . . . ." (*Id.*)

Plaintiff returned on December 14, 2007 for asthma tests. (Tr. at 205-06.) The results indicated she had emphysema and moderate to severe "pulmonary obstructive lung disease, mainly involving the small airways," improved by bronchodilator therapy. (Tr. at 206.) The next month, on January 23, 2008, Plaintiff underwent tests at the Michigan CardioVascular Institute. (Tr. at 207-08.) "[T]he patient does have palpitations and they really do bother her," Dr. Joyce M. Geary wrote. (Tr. at 207.) Yet, there were "no episodes of any serious arrhythmia," and while holter monitoring showed "frequent single [premature ventricular contractions] in bigeminy and trigeminy," her recent stress test was "normal, and there was no evidence of an ischemic response." (Tr. at 207, 209-10.) Dr. Geary explained to Plaintiff that "there [did] not appear to be any evidence of any structural disease of the heart." (*Id.*) Moreover, her left ventricle had "normal systolic function," the blood supply to her heart appeared adequate, and her arrhythmic episodes were not dangerous. (*Id.*) Plaintiff hoped to suppress them nonetheless, but the best treatment plan conflicted with her chronic obstructive pulmonary disease ("COPD"). (*Id.*) Instead, they settled for "a very tiny dose of a cardioselective beta blocker"; "If she is able to tolerate it from a respiratory standpoint and it is helpful for the heart, great; if not, we will stop it." (*Id.*) Finally, Dr. Geary noted that the chest examination was normal. (*Id.*)

9

Plaintiff underwent a battery of tests in 2008, starting in February with a breast ultrasound revealing benign cysts. (Tr. at 275.) Next, her echocardiogram, completed on April 8, 2008, revealed no significant abnormalities. (Tr. at 273.) A chest ultrasound taken on July 29, investigating the cause of her cough, was unremarkable. (Tr. at 272.) In September, still racked by back pain, Plaintiff received a computerized tomography ("CT") scan of her lumbar spine. (Tr. at 270.) Dr. Nasser Qadri reviewed the results, concluding there was "[n]o evidence of acute fracture or subluxation," and "[n]o evidence of significant sized disc herniation causing central or neural foraminal stenosis." (Tr. at 271.) In fact, every disc level appeared healthy, except for "very mild broad-based disc bulge[s]" at L1-L2 and L4-L5. (Tr. at 270.)

In June 2008 she saw her primary physician, Dr. Darin C. Morse, for a routine visit. (Tr. at 239.) The notes are difficult to decipher, but a few stand out: Plaintiff had "much better" range of motion; her right supraclavicle retained fluid and was tender; her breathing was unlabored; her gait was stable; she had proper psychiatric orientation; and she took psychotropic drugs for her depression. (*Id.*) Later that month she returned, noting "[f]ullness" in her neck and shoulders, a mild rash, and right shoulder tenderness. (Tr. at 238.) She rated the pain at level four-and-one-half on the VA scale.[5] (*Id.*) Her range of motion remained "good," and the doctor prescribed Vicodin. (*Id.*) The next set of notes, from October 2008, do not list any physical or mental concerns. (Tr. at 237.)

On January 27, 2009, Plaintiff completed a stress test and electroencephalogram ("EEG"). (Tr. at 268-69.) Dr. Carney's notes from the stress test mention that Plaintiff had asthma and used an inhaler. (Tr. at 268.) Aside from "[m]ild sinus tachycardia," results from both tests were normal.

---

[5] Again, the scale is not defined; whether level five or ten was the most painful is unknown.

10

An electromyogram ("EMG") on April 23, 2009, showed "normal" results, "without clear electrodiagnostic evidence of mononeuropathy, plexopathy, or radiculopathy." (Tr. at 265, 310.) But a few weeks later, on May 6, 2009, Plaintiff went to the emergency room "with [the] chief complaint initially of fatigue and weakness, but she also complained of chest heaviness and just not feeling right." (Tr. at 311-12.) Specifically, earlier in the day she had "a near syncopal episode, complained of being lightheaded and dizzy with ambulation, . . . [and] complained of mid-sternal chest tightness 2/5 which radiated to her neck . . . ." (Tr. at 314.) The ordeal "lasted a few minutes" before the pain "resolved on its own." (*Id.*) The examining physician, Dr. Risty T. Kalivas, did not find the cause of the pain through either the physical examination or diagnostic testing. (Tr. at 313.) Dr. Kalivas noted, however, that nitroglycerin paste was put on her chest in the emergency room. (*Id.*) The notes also mention her non-suicidal depression. (*Id.*)

She was then admitted to Dr. Fattal's chest pain center at the hospital. (*Id.*) There, the nurse could not detect any issues during the physical examination, and the chest x-ray uncovered none either. (Tr. at 315.) She assessed chest pain, hypertension, hyperlipidemia, asthma, and gastroesophageal reflux disease. (*Id.*) The plan involved close monitoring in the clinical decision unit; if she was pain free and her EKG remained normal, she would be released in the morning. (*Id.*)

In September, Plaintiff developed a cough and generalized body aches. (Tr. at 321.) Dr. Fred Dunham heard a slight wheeze and noticed "some faint congestion," but otherwise found no problems. (Tr. at 322.) Albuterol improved her breathing and a chest x-ray ruled out pneumonia; they gave her antibiotics and discharged her. (Tr. at 322-23.)

11

The records from the last half of 2009 contain numerous diagnostic results. A brief note from September 14 described chest x-ray findings: "[T]wo views of the chest show no acute abnormalities. The heart size is normal and lung fields are clear." (Tr. at 264.) Mammogram results returned the next day, showing no significant changes and indicating again that the cysts were benign. (Tr. at 263.) "Films" of her left shoulder showed that nothing was amiss with her bones, joint spaces, or the surrounding soft tissues. (Tr. at 261.) It was, Dr. Rogers wrote, a "normal examination." (*Id.*) Blood tests in December flagged Plaintiff's high level of low-density lipoprotien ("LDL") cholesterol, (Tr. at 242), known as the "bad cholesterol." Anthony Colpo, *LDL Cholesterol: "Bad" Cholesterol, or Bad Science?*, 10 J. Am. Physicians & Surgeons 83, 83, 87 (2005).

Neck and shoulder pain continued to plague her through December. (Tr. at 230.) At a visit with Dr. Morse on December 6, she had difficulty abducting and rotating her shoulders, though her neck was supple. (Tr. at 230.) Later that month, Dr. Clinton E. Rogers administered an ultrasound of her neck and shoulders to investigate the potential cause. (Tr. at 259-61.) He found no abnormalities, such as cysts or solid masses, and her vascular structures "were unremarkable." (Tr. at 259-60.)

Plaintiff tumbled down the stairs at home on December 17, 2009 and an hour later rushed to the emergency room complaining that her "right shoulder, right humerus, and right lateral rib cage" hurt. (Tr. at 325.) The physical examination confirmed the pain, but also revealed that she had full range of motion at the elbow, wrist, and fingers. (Tr. at 326.) X-rays showed no fractures or other issues. (Tr. at 255-57, 326-30.) She received injections, "felt significantly improved," and was discharged. (Tr. at 326.) Notes from visits to Dr. Morse show that the pain from the fall

continued over the few next weeks. (Tr. at 228-29.) In January 2010, Dr. Gregory Pinnell ordered magnetic resonance imaging ("MRI") of Plaintiff's shoulder. (Tr. at 332.) He concluded that she had "[t]endinosis of the supresinatus tendon," but no rotator cuff tear. (*Id.*)

She was also feeling more anxious, even becoming tearful when describing her anxiety to Dr. Morse in January 2010. (Tr. at 228.) He prescribed Xanax. (*Id.*) Her mood continued to spiral downward by the next appointment, on February 4. (Tr. at 227.) She conversed normally on most subjects, and was euthymic with the staff, but cried when talking about her mood. (*Id.*) She claimed that anxiety attacks had beset her over the last year, she lacked energy, and her mood fluctuated wildly. (*Id.*) Her medications helped, but did not prevent her emotional deterioration. (*Id.*) Dr. Morse, noting that he did not believe she was suicidal, decided to change her medications and planned to check in the following week. (*Id.*) During that session, she told him, "'I'm doing much better,'" and the new prescription regimen seemed effective. (Tr. at 226, 290.) By their first March session, Dr. Morse though her "mood/affect" was appropriate. (Tr. at 225.)

On January 19, she suffered an "[a]cute questionable anxiety/panic attack," according to the emergency room report. (Tr. at 334.) "[S]he was doing fine this morning," she told the examiner, Dr. Lance Freeman, but then "had [a] sudden onset in which she felt kind of short of breath. She did feel somewhat anxious. . . . She denied actual pain across the chest . . . ." (*Id.*) Her neck was supple, her lungs were clear, and the various test results failed to show any significant issue. (Tr. at 335, 338-39.) Dr. Freeman observed that she appeared to have no chest pain and, in light of Plaintiff's similar complaints at the emergency room on May 6, 2009, he discharged her. (*Id.*)

13

When Dr. Morse saw her on March 12, 2010, he concluded that her hypertension, anxiety, and leg pain were stable, though she now had left-leg edema. (Tr. at 224, 287.) However, twelve days later, as she arranged her children's clothing, she "became diaphoretic and flushed, got very lightheaded, [and] had to ease herself to the floor." (Tr. at 340.) She "became a little nauseous, but did not vomit," and was "a little short of breath." (Tr. at 340-41.) The symptoms dissipated when she sat down, (Tr. at 342), and ended completely after ten minutes. (Tr. at 340.) She called for an ambulance and arrived at the hospital, where she explained her symptoms to the examiner and added that she was not numb or weak, felt no tingling, and was experiencing no respiratory problems. (Tr. at 341.) No concerns were highlighted in the objective portions of the report, including the physical examination and diagnostic testing. (Tr. at 341-42, 344-47.) Her breathing was clear and her chest felt fine, but at the emergency room, "she start[ed] crying, saying she just does not feel well." (Tr. at 342.) Dr. Richard Ross concluded, "At this time we do not have anything else as a source for her feeling this way." (Tr. at 342-43.)

Plaintiff filled out a report for the state agency on May 21, 2010, describing her limitations. (Tr. at 182-90.) She managed her personal care, but could not "bend over too far" while dressing. (Tr. at 184.) Preparing meals, such as frozen dinners, soups, and sandwiches, took her one to three hours because she struggled to stand. (Tr. at 185.) She handled indoor but not outdoor chores, and needed encouragement to complete them. (*Id.*) She attended church twice per week, and traveled by walking, driving, or using public transportation. (Tr. at 186.) Paying bills and counting change were not difficult, but she did not have a savings account and "can't have a checking [a]ccount," she noted. (*Id.*) She spent her days watching television, reading the bible, and speaking with friends on the phone. (Tr. at 187.) She said that she could "go[] out" alone, but also that she needed

14

someone to accompany her on social activities. (Tr. at 186-87.) Her mood often soured, becoming

irritable, argumentative, and even "very agressive [sic] . . . ." (Tr. at 188.) "I think people are out

to ge[t] me," she asserted. (Tr. at 189.) Slow walking could take her for less than one mile, then

she needed twenty minutes of rest. (Tr. at 188) Concentrating on tasks and following instructions

proved difficult, and she claimed her rapport with authority figures was not stellar. (Tr. at 188-89.)

Her daughter completed a similar form a few days later. (Tr. at 156-63.) She agreed that

Plaintiff struggled to bend while dressing, took one to three hours to prepare meals, could finish

light indoor chores, drive, shop, pay bills, and count change. (Tr. at 157-59.) Plaintiff read,

watched television, and crocheted during the day. (Tr. at 160.) Her daughter estimated that she

could lift less than fifteen pounds, but not over twenty, and walk half a mile to a one mile without

stopping. (Tr. at 161.) Plaintiff was "easily distracted except for when reading her bible or words

of wisdom." (*Id.*)

On July 20, 2010, Plaintiff returned to the emergency room complaining of lower back pain.

(Tr. at 348-49, 421.) She could not recall a triggering event, and she walked without assistance.

(Tr. at 349, 421-22.) The treatment notes state, "Clinically she looks well. She did receive some

Dilaudid and Phenergan with good relief of her symptoms. [W]e will send her home with a

prescription for some Vicodin." (*Id.*)

Plaintiff described her pain to Dr. Morse on August 25, 2010. (Tr. at 300, 426.) Her

shoulder and arms constantly ached, the pain registering at five out of five on a VA scale. (*Id.*) Her

lower back pain was similarly sharp and constant, though she rated it at four-out-of-five on a VA

scale. (*Id.*) Her anxiety and depression persisted, but she did not feel suicidal or helpless, and

Abilify seemed to help. (Tr. at 301, 427.) Dr. Morse's physical examination was more thorough

than usual: auscultation revealed regular cardiovascular rhythm and rate and normal respiration; her gait was normal and she could "undergo exercise testing and/or participate in exercise program[s]"; her right arm and both legs had normal range of motion and strength; her left arm had limited rotation and shoulder abduction, and dulled sensation; and her mood was euthymic and her affect, full. (Tr. at 302, 428.)

Plaintiff saw Dr. Michael Brady, a consultative psychologist, the next month. (Tr. at 361.) She informed him that her depression had lasted five years, and it manifested in various ways: she felt sad, avoided people including family, stayed indoors, felt worthless, and considered suicide within the past year. (*Id.*) It also decreased her concentration, libido, motivation, and made her irritable. (*Id.*) She quit her last job, as a chore provider, in 2010 due to her emotional problems. (Tr. at 362.) Her household included her mother and daughter, and her social activities consisted of visits from friends and attending church. (*Id.*) Otherwise, she typically croqueted, read, and watched television. (*Id.*)

Dr. Brady found no problems with her attitude, behavior, thought content, or mental activity stream, but he noted she appeared depressed and struggled with a few mental capacity tasks. (Tr. at 362-64.) He concluded that she met the "diagnostic criteria for Major Depressive Disorder," apparently based on her subjective complaints, as he explained his conclusion by repeating those complaints. (Tr. at 364.) He added that she had "marginal" ability to relate with others, her ability to complete tasks was not "significantly impaired," she could maintain a "fair" level of concentration, and "[h]er ability to withstand the normal stressors associated with a workplace setting [was] somewhat impaired." (*Id.*) He assigned a Global Assessment of Functioning of fifty-five, indicating "[m]oderate symptoms (e.g., flat affect and circumstantial speech, occasional panic

16

attacks) OR moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Am. Psychiatric Ass'n, *Diagnostic and Statistical Manual of Mental Disorders* 34 (4th ed., text rev. 2000).

Plaintiff went to the hospital on October 21, 2010, complaining of acute lower back pain radiating to her left leg, as well as "epigastric" pain. (Tr. at 419.) The physical examination raised no flags and even showed she had normal muscle strength in all extremities. (*Id.*) She received various medicines in the emergency department "that completely resolved both her epigastric pain and low back pain." (*Id.*) She was promptly discharged. (Tr. at 419-20.)

Dr. Morse examined Plaintiff again on October 27, 2010. (Tr. at 387, 439.) A rash had formed on her face, neck and iguinal area, and her low back pain continued, now radiating to her right leg. (*Id.*) The pain remained constant, increasing when she sat or stood for long periods, but was relieved by the Dilaudid administered in the emergency room. (*Id.*) She rated it at level four out of five on a VA scale. (Tr. at 388, 440.) Dr. Morse noted spasms and Plaintiff's "difficulty tolerating position changes . . . ." (*Id.*) He assessed lumbar, pelvis, and sacrum dysfunction, along with muscle spasm and right and left "backward sacral torsion." (*Id.*) She received a heel lift and prescriptions. (Tr. at 389, 441.)

Plaintiff had a "wellness visit" with Dr. Morse on November 10, 2010. (Tr. at 390, 441-42.) Her pain remained at level four, constant and sharp; Dr. Morse assessed nonallopathic lesions in her spine and pelvic region and ordered osteopathic manipulation. (Tr. at 391, 443.) He also continued her Vicodin prescription to ease the back pain. (*Id.*) The pain level increased to five at a visit the week after. (Tr. at 394-95, 446-47.) Her respiratory and cardiovascular systems appeared healthy, however, and her mood was euthymic. (Tr. 395-96, 447-48.) They discussed exercise

options and how to quit smoking. (Tr. at 396, 448.) The notes mention her history of chest pain, though they do not suggest she was suffering from it around the visit. (*Id.*) Dr. Morse posited it could be related to gastrointestinal problems and referred her to a specialist. (*Id.*) The pain stayed at level four during the next visit, on November 24, 2010. (Tr. at 397, 448-49.)

Plaintiff's chest began hurting during a three-hour bus ride back from a casino on November 14, 2010. (Tr. at 407, 416.) She went to the emergency room and, after taking nitroglycerin, the pain "completely disappeared." (*Id.*) A host of tests and various doctors could not find any significant health issues and the hospital discharged her. (Tr. at 407-13.)

She was back at the emergency room on March 16, 2011, due to back pain, particularly in her upper right back. (Tr. at 404.) She denied chest pain, shortness of breath, or nausea. (*Id.*) The examiner verified the upper back pain, but could not elicit lower back pain, which she complained about to triage. (Tr. at 405.) She also had "no costovertebral angle tenderness." (*Id.*) The chest x-ray was negative and, after using an albuterol inhaler, "[s]he was feeling significantly better" and was "discharged home in stable condition." (*Id.*) The x-ray and the notes suggest she had bronchitis. (Tr. at 405-06.)

That day, Dr. Morse also filled out a single-page functional capacity report consisting mostly of check-mark answers. (Tr. at 423.) She could lift less than ten pounds for one-third or less of a workday, stand for less than two hours, sit for less than six hours, and would have moderate difficulties with her right arm. (Tr. at 423.) Her anxiety would also affect her performance. (*Id.*) All of the symptoms combined would disrupt her work at least half the time. (*Id.*)

At the administrative hearing, Plaintiff admitted she worked as a chore provider after the disability onset date, for about twenty hours per week doing light housework and cooking. (Tr. at

48.) She then recounted her various impairments and medications. (Tr. at 49-50.) For her asthma, she used a nebulizer, once in the past three months, and an inhaler, generally twice per week. (Tr. at 50.) The medications did not produce noticeable side effects. (Tr. at 50-51.) Her right shoulder hurt, but she struggled to explain why: "[W]hen I went to get the MRI done on it, they said something about the contention or something. It's not the rotatary [sic] cup [sic], but it's like bruised or something up in there . . . ." (Tr. at 51.) Dr. Morse intended to refer her to physical therapy and had given her exercises that provided "[v]ery little" improvement. (Tr. at 51-52.)

She lacked insurance until recently, she claimed, explaining why she had not sought mental health treatment. (Tr. at 52.) Discussing her mental issues, she said that in large crowds she would grow nervous, sweat, and lose her breath. (Tr. at 52-53.) She now lived alone and socialized with her children and grandchildren, perhaps once or twice per week. (Tr. at 53.) In addition to the activities she mentioned in her 2010 report, she also would infrequently go to restaurants. (Tr. at 54-55.) Asked if she was "able to drive," she responded that she did not have a license and did not drive. (Tr. at 55.)

The ALJ then asked the vocational expert ("VE") to assume a hypothetical individual who was

> the same age, [and had the same] education and work experience as the Claimant. Further, assume this person can perform work at the light exertional level. She can occasionally push-pull with her bilateral upper extremities. She can never climb ladders, ropes or scaffolds, but can frequently climb ramps or stairs and can occasionally crawl. She can occasionally reach with her right upper extremity. She should avoid concentrated exposure to temperature extremes, humidity and pulmonary irritants such as smoke, dust and fumes.
>
> She should avoid even moderate exposure to workplace hazards such as moving machinery and unprotected heights. She can perform simple routine repetitive tasks and can occasionally interact with supervisors, coworkers and the general public.

19

(Tr. at 59.) "Could this person perform the Claimant's past work?" she asked. (Tr. at 59.) "No," the VE responded, but added that other work existed that the person could perform: assembly at a bench or table (4500 positions in Michigan); inspection at a bench or table (1,600 positions in Michigan), and packaging at a bench or table (2500 positions in Michigan). (Tr. at 60.) Would the analysis change if the individual degenerated and now could only manage sedentary positions, the ALJ inquired. (*Id.*) That individual could work as a assembler (1700 positions in Michigan), packager (1,000 positions in Michigan), and surveillance system monitor (400 positions in Michigan). (*Id.*) If this hypothetical person could not concentrate for fifteen percent of the workday, the VE thought he or she could not work. (*Id.*)

**F.     Analysis and Conclusions**

**1.     Legal Standards**

The ALJ determined that during the time Plaintiff qualified for benefits, she had the residual functional capacity ("RFC") to perform a limited range of light work:

> [S]he can only occasionally push and pull with her bilateral upper extremities. She can never climb ladders, ropes or scaffolds, but can frequently climb ramps and stairs and occasionally reach with her right upper extremity. She should avoid concentrated exposure to temperature extremes, humidity, and pulmonary irritants such as smoke, dust and fumes. She should avoid even moderate exposure to workplace hazards such as moving machinery and unprotected heights. The claimant can perform simple, routine, repetitive tasks and can occasionally interact with supervisors, coworkers and the general public.

(Tr. at 34.) Light work

> involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls. To be considered capable of performing a full or wide range of light work, you must have the ability to do substantially all of these activities. If someone can do light work, we determine that he or she can also do sedentary work, unless

20

there are additional limiting factors such as loss of fine dexterity or inability to sit
for long periods of time.

20 C.F.R. §§ 404.1567(b), 416.967(b).

After review of the record, I suggest that the ALJ utilized the proper legal standard in his

application of the Commissioner's five-step disability analysis to Plaintiff's claim. I turn next to

the consideration of whether substantial evidence supports the ALJ's decision.

### 2.    Substantial Evidence

If the Commissioner's decision applied the correct legal standards and is supported by

substantial evidence, the decision must be affirmed even if this Court would have decided the

matter differently and even where substantial evidence could justify the opposite conclusion. 42

U.S.C. § 405(g); *McClanahan*, 474 F.3d at 833; *Mullen*, 800 F.2d at 545. In other words, where

substantial evidence supports the ALJ's decision, it must be upheld.

Plaintiff's entire argument is easily reproducible. She criticizes the ALJ's hypothetical for

inaccurately describing her impairments, citing regulations and case law explaining this

requirement and also law concerning the RFC. (Doc. 10 at 7-11.) She then notes that she has

"documented . . . chronic back pain, hypertension, right shoulder disorder, asthma, anxiety and

obesity, yet the ALJ found claimant is capable of making a successful adjustment to other work

. . . ." (*Id.* at 9.) Following this statement, she recounts her testimony at the hearing, and no other

evidence, in her full argument:

> The claimant testified at the hearing that she has chronic low back pain. She also
> suffers from shoulder pain, as well as anxiety and depression. As a result, she cannot
> do any overhead work. She's extremely limited in her ability to lift her dominant
> right arm. In fact, she doesn't even like to be around any people due to her anxiety
> and depression. Not only is she limited in her ability to lift and be around people, but
> she's also limited in her ability to care for her grandchildren due to the chronic low
> back pain and inability to lift.

As a result, she is required to take medications. As expected, these medications make her tired throughout the day. Because of the fatigue, she is requires [sic] frequent naps–2 a day at about 45 minutes per nap.

Aside from her physical complaints and ailments, she does not have a driver's license and does not own a vehicle. She takes a taxi everywhere that she goes, or she has her children drive her. Clearly, she does not have a steady means of getting to a job. To this, a VE would correctly conclude that any more than 2-3 unscheduled absences from work per month would be work preclusive. The VE already testified that being off task at least 15% of the time would render an individual unemployable as it would be work preclusive.

Finding that Ms. Brewer is capable of performing the positions of inspector, assembler, and packer while she would continuously require the need to use her right upper extremity, stand, sit, and walk is erroneous. She can't do this. To subject Ms. Brewer to perform these positions subjects her to further injury. Requiring someone with these disabilities to be subjected to the possibility of more pain and humiliation is not justified, it's inhumane. The limitations that Ms. Brewer faces effectively preclude her from performing any work, including the listed representative occupations, and the reasoning to support her lack of credibility is not substantiated.

(*Id.* at 9-10) (citations omitted). She then re-explains the RFC and ends,

Ms. Brewer indicated that she is limited in her ability to lift and do any overhead work, be around people, and suffers from chronic low back pain. How can a person who cannot use their dominant arm and is limited in sitting, standing, and walking possibly be expected to perform any of these positions? They can't. Ms. Brewer could not engage in any type of job where it entails using his [sic] right arm on a continuous, or even occasional, basis. The first two hypotheticals are improper.

(Tr. at 11) (citations omitted). That is it. In essence, she relies on lines from her testimony–and no other evidence–to make her case.

Plaintiff's lack of analysis tempts the Court to accept Defendant's argument that Plaintiff has waived her claims by leaving them undeveloped. (Doc. 11.) The Sixth Circuit has explained waiver in this context: "This court has consistently held that . . . arguments adverted to in only a perfunctory manner, are waived." *Kuhn v. Washtenaw Cnty.*, 709 F.3d 612, 624 (6th Cir. 2013). *See also Aarti Hospitality*, *L.L.C. v. City of Grove City, Ohio*, 350 F. App'x 1, 11 (6th Cir. 2009)

22

("After setting forth the applicable law on their due process claim, plaintiffs devote one sentence in their appellate brief to 'arguing' why the district court's judgment should be reversed . . . . Accordingly, we deem plaintiffs' appeal of their due process claim forfeited."); *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *2 (E.D. Mich. Mar. 24, 2014) (holding that claim on appeal from ALJ's decision was waived because plaintiff referred to it in a perfunctory manner); *Preston v. Comm'r of Soc. Sec.*, No. 12-13327, 2013 WL 4550512, at *7 (E.D. Mich. Aug. 28, 2013) (finding waiver where "Plaintiff failed to identify a specific medical opinion the ALJ erred in evaluation") (adopting report and recommendation); *Perry ex rel. King v. Comm'r Soc. Sec.*, No. 12-cv-14439, 2013 WL 3328523, at *7 (E.D. Mich. July 2, 2013) ("Plaintiff cites to case law that ALJs must provide good reasons for discounting the opinions of the claimant's treating physicians, but she has not identified any treating physician opinion that she believes the ALJ overlooked or improperly weighed.") (adopting Report & Recommendation).

Defendant points out that while Plaintiff grumbles that the ALJ did not adopt her testimony, "she has presented scant argument as to why that testimony had to be believed." (Doc. 11 at 9.) Plaintiff does not address the credibility findings or even cite evidence outside of her testimony. (Doc. 10 at 9-11.) Another court in this district, facing a similar argument from Plaintiff's counsel, noted, "[T]he ALJ specifically found Kirchner's subjective complaints to be less than fully credible, and Kirchner makes no direct argument attaching the ALJ's credibility finding, therefore that stands." *Kirchner v. Colvin*, No. 12-cv-15052, 2013 WL 5913972, at *11 (E.D. Mich. Nov. 4, 2013) (adopting Report & Recommendation). Plaintiff also makes an odd, largely irrelevant contention that her lack of a driver's license will cause her to miss work, therefore she should be considered physically disabled. (Tr. at 10.) Disability benefits are not a boon for those without

licenses or cars. Further, the record does not indicate her physical condition causes her not to drive; she told the ALJ, when asked if she was able to drive, simply that she does not, (Tr. at 55), and she and her daughter said in pre-hearing reports that she could. (Tr. at 159, 186.)

In fact, Plaintiff's counsel's use of similar, often verbatim, arguments in other cases have garnered a thickening stack of court opinions questioning whether to deem them waived.[6] As Judge

---

[6] *See, e.g.*, *Alexander v. Commissioner of Soc. Sec.*, No. 13-cv-12434, 2014 WL 4678057, at *5 (Sept. 18, 2014) (adopting Report & Recommendation) ("Plaintiff's brief predominately contains recitations of law with no discernable connection to the few details Plaintiff provided the record evidence."); *Doyle v. Comm'r of Soc. Sec.*, No. 13-12916, 2014 WL 4064251, at *18 (E.D. Mich. Aug. 18, 2014) (adopting Report & Recommendation) ("To the extent Plaintiff relies on the treating source rule to support any of his arguments, he has waived the argument."); *Barringer v. Comm'r of Soc. Sec.*, No. 13-CV-12746, 2014 WL 4064575, at *13 n.10 (E.D. Mich. Aug. 18, 2014) ("Throughout this Opinion, the Court has referenced the confusing and undeveloped nature of many of Plaintiff's arguments."); *Gutierrez v. Comm'r of Soc. Sec.*, No. 13-cv-12314, 2014 WL 3956177, at *9 (E.D. Mich. Aug. 13, 2014) (adopting Report & Recommendation) (finding "plaintiff's arguments are wholly insufficient and undeveloped"); *Little v. Comm'r of Soc. Sec.*, No. 13-CV-13558, 2014 WL 3778213, at *8 (E.D. Mich. July 31, 2014) (adopting Report & Recommendation) (calling argument "quite undeveloped"); *Beardsley v. Comm'r of Soc. Sec.*, No. 13-cv-12954, 2014 WL 3125128, at *9 (E.D. Mich. July 8, 2014) (adopting Report & Recommendation) (noting that Plaintiff's "arguments are, at best, skeletal in nature, and at worst, nonexistent"); *Larner v. Comm'r of Soc. Sec.*, No. 13-11464, 2014 WL 1746529, at *6 n.7 (E.D. Mich. Apr. 30, 2014) (adopting Report & Recommendation) ("Numerous judges of this Court have criticized Plaintiff's counsel for his penchant for raising generalized but undeveloped arguments lacking citation to or support in the record . . . ."); *Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *1-2 (E.D. Mich. Mar. 24, 2014) (finding Plaintiff's claims waived); *Fowler v. Comm'r of Soc. Sec.*, No. 12-12637, 2013 WL 5372883, at *15 (E.D. Mich. Sept. 25, 2013) (adopting Report & Recommendation) (finding argument "wholly insufficient and undeveloped"); *Villarreal v. Comm'r of Soc. Sec.*, No. 12-cv-12041, 2013 WL 3981008, at *6 (E.D. Mich. Aug. 1, 2013) (adopting Report & Recommendation) (characterizing argument as "vague and undeveloped"); *Ramsey v. Comm'r of Soc. Sec.*, No. 12-13328, 2013 WL 3835171, at *5 n.9 (E.D. Mich. July 24, 2013) (adopting Report & Recommendation) (finding an argument "unclear, undeveloped, and waived"); *Valdez v. Comm'r of Soc. Sec.*, No. 12-13215, 2013 WL 3013668, at * (E.D. Mich. June 18, 2013) (adopting Report & Recommendation) ("Plaintiff recites the treating-source rule and accompanying law, but makes no effort to apply that law to this case."); *Burger v. Comm'r of Soc. Sec.*, No. 12-CV-11763, 2013 WL 2285375, at *5 (E.D. Mich. May 23, 2013) (adopting Report & Recommendation) (noting that "Plaintiff's brief is completely devoid of any discernable legal argument," and recommending finding the arguments waived); *Dice v. Comm'r of Soc. Sec.*, No. 12-cv-11784, 2013 WL 2155528, at *3 (E.D. Mich. Apr. 19, 2013) ("Plaintiff's brief is, at best, sparse and difficult to follow. . . . In the view of the undersigned, plaintiff's argument is wholly insufficient and undeveloped."); *Deguise v. Comm'r of Soc. Sec.*, No. 12-10590, 2013 WL 1189967, at *7 (E.D. Mich. Feb. 19, 2013) ("Plaintiff's arguments . . . are so woefully underdeveloped that they need not be considered any further."), *adopted by* 2013 WL 1187291, at *1 (E.D. Mich. Mar. 22, 2013); *Corlew v. Comm'r of Soc. Sec.*, No. 12-10004, 2013 WL 1190208, at * (E.D. Mich. Feb. 19, 2013) ("Plaintiff's arguments are so woefully underdeveloped that they need not be considered any further."), *adopted by* 2013 WL 1187515, at *1 (E.D. Mich. Mar. 22, 2013); *Jackson v. Comm'r of Soc. Sec.*, No. 11-14672, 2013 WL 1148417, at *7 (E.D. Mich. Feb. 19, 2013) (calling Plaintiff's argument "wholly insufficient and undeveloped"), *adopted by* 2013 WL 1148416, at *1 (E.D. Mich. Mar. 19, 2013); *Polzin v. Comm'r of Soc. Sec.*, No. 11-15030, 2013 WL 1148187, at *6 (E.D. Mich. Feb. 15, 2013) ("Plaintiff's argument is wholly insufficient and undeveloped."), *adopted by* 2013 WL 1148008, at *1 (E.D. Mich. Mar. 19, 2013); *Bush v. Astrue*, No. 12-11790, 2013 WL 1747807, at *14 (E.D. Mich. Jan. 25, 2013) ("Bush's failure to make any developed arguments about any alleged errors in the ALJ's decision could permit this court to

Linda Parker stated of Plaintiff's counsel, he "has developed a reputation in this District for submitting briefs on behalf of social security claimants that are thoroughly deficient and devoid of proper factual substance and legal analysis." *Sadler v. Comm'r of Soc. Sec.*, No. 13-13552, 2014 WL 4724767, at *6 (E.D. Mich. Sept. 23, 2014). Judge Robert Cleland, considering sanctions against him, wrote that his "superficial, cut-and-paste, template approach to fulfilling his professional duty to substantively brief the issues presented for the court's consideration and determination fails to comply with all accepted rules of civil pleading and practice in this District." *Pawloski v. Comm'r of Soc. Sec.*, No. 13-11445, 2014 WL 3767836, at *6 (E.D. Mich. July 31, 2014). Chief Judge Gerald Rosen warned him that

> [i]n light of this lamentable record of filing one-size-fits-all briefs . . . Plaintiff's counsel is strongly cautioned that this Court will carefully examine his submissions in future suits to ensure that they advance properly supported arguments that rest upon (and cite to) the facts of a particular case. Failure to adhere to these standards will result in the imposition of sanctions and possible referral of counsel for disciplinary proceedings.

*Fielder v. Comm'r of Soc. Sec.*, No. 13-10325, 2014 WL 1207865, at *1 n.1 (E.D. Mich. Mar. 24, 2014).

The grounds for waiver are clear, but I instead suggest reviewing the ALJ's decision for substantial evidence. In particular, the record shows the credibility findings were proper, the ALJ adequately handled opinion evidence, and the RFC was well supported.

### a.   Medical Sources and Plaintiff's Credibility

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B); *accord* 20 C.F.R. § 404.1520(a)(3); *Wyatt*, 974 F.2d at 683. The regulations carve the evidence into various categories, but the only relevant distinction for present purposes is between "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources"

---

disregard his brief . . . ."), *adopted by* 2013 WL 1747828, at *1 (E.D. Mich. Apr. 23, 2013).

include, among others, licensed physicians and licensed or certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). There are important differences between the two types of sources. For example, only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2.

Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her residual functional capacity. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources, including treating opinions not given controlling weight, 20 C.F.R. § 404.1527(c), and the ALJ should almost certainly use the same analysis for "other source" opinions as well. *See Cruse*, 502 F.3d at 540-42; SSR 06-3p, 2006 WL 2329939, at *2. The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson*, 378 F.3d at 544. *See also* 20 C.F.R. § 404.1527(c).

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378

F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2. The ALJ "will not give any special significance to the source of an opinion[, including treating sources]," regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's residual functional capacity ("RFC"),[7] and the application of vocational factors. *Id.* § 404.1527(d)(3).

Additionally, a physician's "notation in his notes of a claimed symptom or subjective complaint from the patient is not medical evidence; it is the 'opposite of objective medical evidence.' . . . An ALJ is not required to accept the statement as true or to accept as true a physician's opinion based on those assertions." *Masters v. Astrue*, 818 F. Supp. 2d 1054, 1067 (N.D. Ill. 2011) (quoting *Schaaf v. Astrue*, 602 F.3d 869, 875 (7th Cir. 2010)) "Otherwise, the hearing would be a useless exercise." *Id. See also Francis v. Comm'r of Soc. Sec.*, 414 F. App'x 802, 804 (6th Cir. 2011) (noting that there was no medical opinion in "Dr. Kllefer's pain-related statement . . . [because] it merely regurgitates Francis's self-described symptoms."); *Poe v. Comm'r of Soc. Sec.*, 342 F. App'x 149, 156 (6th Cir. 2009) ("[S]ubstantial evidence supports the ALJ's determination that the opinion of Dr. Boyd, Poe's treating physician, was not entitled to deference because it was based on Poe's subjective complaints, rather than objective medical data.").

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2). *See also Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

---

[7] The Commissioner's discretion to determine the claimant's RFC is less capacious than it appears at first. While the ALJ determines the RFC, the ALJ might be required to give controlling weight to treating source opinions on specific limitations. *See* 20 C.F.R. § 404.1513(b)-(c) (describing that medical reports can include a source's "statement about what [the claimant] can still do despite [her] impairments"). These opinions would necessarily affect the RFC. *See Green-Young v. Barnhart*, 335 F.3d 99, 106-07 (2d Cir. 2003) (holding that treating physician's opinion that claimant could not sit or stand for definite periods "should have been accorded controlling weight").

must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ can properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec. of Health & Human Servs*, 882 F. Supp. 637, 640-41 (E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision). "This requirement is not simply a formality; it is to safeguard the claimant's procedural rights." *Cole*, 2011 WL 2745792, at *4. "[A] failure to follow the procedural requirement of identifying the reasons for discounting the opinions and for explaining precisely how those reasons affected the weight accorded the opinions denotes a lack of substantial evidence, even where the conclusion of the ALJ may be justified based upon the record." *Rogers*, 486 F.3d at 243.

When a disability determination that would be fully favorable to a claimant cannot be made solely on the basis of the objective medical evidence, an ALJ must analyze the credibility of the claimant, considering the claimant's statements about pain or other symptoms with the rest of the relevant evidence in the record and factors outlined in Social Security Ruling 96-7p. Credibility determinations regarding a claimant's subjective complaints rest with the ALJ. *See Siterlet v. Sec'y of Health & Human Servs.*, 823 F.2d 918, 920 (6th Cir. 1987). Generally, an ALJ's credibility assessment can be disturbed only for a "compelling reason." *Sims v. Comm'r of Soc. Sec.*, No. 09-5773, 2011 WL 180789, at *4 (6th Cir. Jan. 19, 2011) (citing *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001)); *Warner*, 375 F.3d at 390. However, "[i]f an ALJ rejects a claimant's testimony as incredible, he must clearly state his reasons for doing so." *Felisky*, 35 F.3d at 1036.

The social security regulations establish a two-step process for evaluating subjective symptoms, including pain. 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2. The ALJ evaluates complaints of disabling pain by confirming that objective medical evidence of the underlying condition exists. The ALJ then determines whether that condition could reasonably be expected to produce the alleged pain or

28

whether other objective evidence verifies the severity of the pain. *See* 20 C.F.R. § 404.1529; SSR 96-7p, 1996 WL 374186, at *2; *Stanley v. Sec'y of Health & Human Servs.*, 39 F.3d 115, 117 (6th Cir. 1994); *Felisky*, 35 F.3d at 1038-39; *Duncan v. Sec'y of Health & Human Servs.*, 801 F.2d 847, 853 (6th Cir. 1986). The ALJ ascertains the extent of the work-related limitations by determining the intensity, persistence, and limiting effects of the claimant's symptoms. SSR 96-7p, 1996 WL 374186, at *2.

While "'objective evidence of the pain itself'" is not required, *Duncan*, 801 F.2d at 853 (quoting *Green v. Schweicker*, 749 F.2d 1066, 1071 (3d Cir. 1984)), a claimant's description of his physical or mental impairments alone is "not enough to establish the existence of a physical or mental impairment," 20 C.F.R. § 404.1528(a). Nonetheless, the ALJ may not disregard the claimant's subjective complaints about the severity and persistence of the pain simply because they lack substantiating objective evidence. SSR 96-7p, 1996 WL 374186, at *1. Instead, the absence of objective confirming evidence forces the ALJ to consider the following factors:

(i)     [D]aily activities;

(ii)    The location, duration, frequency, and intensity of . . . pain;

(iii)   Precipitating and aggravating factors;

(iv)    The type, dosage, effectiveness, and side effects of any medication . . . taken to alleviate . . . pain or other symptoms;

(v)     Treatment, other than medication, . . . received for relief of . . . pain;

(vi)    Any measures . . . used to relieve . . . pain.

20 C.F.R. § 404.1529(c)(3). *See also Felisky*, 35 F.3d at 1039-40; SSR 96-7p, 1996 WL 374186, at *3. Furthermore, the claimant's work history and the consistency of her subjective statements are also relevant. 20 C.F.R. § 404.1527(c); SSR 96-7p, 1996 WL 374186, at *5.

"It is of course for the ALJ, and not the reviewing court, to evaluate the credibility of witnesses, including that of the claimant." *Rogers*, 486 F.3d at 247. *See also Cruse*, 502 F.3d at 542 (noting that the "ALJ's credibility determinations about the claimant are to be given great weight, 'particularly since the

ALJ is charged with observing the claimant's demeanor and credibility'" (quoting *Walters*, 127 F.3d at 531 ("Discounting credibility to a certain degree is appropriate where an ALJ finds contradictions among medical reports, claimant's testimony, and other evidence."))); *Jones*, 336 F.3d at 475 ("[A]n ALJ is not required to accept a claimant's subjective complaints and may . . . consider the credibility of a claimant when making a determination of disability."). "However, the ALJ is not free to make credibility determinations based solely on an 'intangible or intuitive notion about an individual's credibility.'" *Rogers*, 486 F.3d at 247 (quoting SSR 96-7p, 1996 WL 374186, at *4).

      **b.**    **Analysis**

Plaintiff attacks the ALJ's findings for distorting her limitations in the RFC. She does not address the ALJ's credibility analysis. Nor does she do more to counter the ALJ's specific points than simply recount some of her testimony and baldly assert that this convincingly contradicts the ALJ's findings. In fact, she contends that the contradiction raised by these scattered statements is so clear that the RFC is not merely mistaken but actually "inhumane." (Doc. 10 at 10.)

The ALJ's discussion shows that she sufficiently "consider[ed]" the evidence. 42 U.S.C. § 423(d)(5)(B); 20 C.F.R. §§ 404.1520(a)(3), 416.920(a)(3). First, the ALJ stated that she reviewed the Record under the relevant regulations and rulings. (Tr. at 21, 24.) In similar contexts, the Sixth Circuit has found such statements to approach the minimum needed to satisfy the regulatory requirements. *White v. Comm'r of Soc. Sec.* 572 F.3d 272, 287 (6th Cir. 2009) ("[T]he ALJ expressly stated that she had considered S.S.R. 97-7p, which details the factors to address in assessing credibility. There is no indication that the ALJ failed to do so."). In any case, the ALJ went on to describe substantial sections of the medical evidence, highlighting information related to the factors in 20 C.F.R. §§ 404.1527(c), 416.927(c). (Tr. at 22-31.)

The ALJ appropriately examined how Plaintiff's daily activities, social functioning, and mental capacities reflected her impairments, incorporating some of her subjective complaints. (Tr. at 23.) The

decision recognizes Plaintiff's "mild restriction" in daily life: she handles her personal care, aside from bending over while dressing, and she cooks, shops, and cleans with her daughter's help. (Tr. at 32, 48, 157-59.) She also took at least one trip to a casino, as the ALJ noted, riding three-hours on a bus there and back. (Tr. at 37, 407, 416.) The ALJ acknowledged that "[C]laimant's statements regarding her activities of daily living that were credible did lend some minimal support to her allegations and were therefore accounted for in part by placing the claimant at the light level of exertion . . . ." (Tr. at 37.)

The decision correctly found that the objective evidence, which the ALJ extensively recounted, outweighed Plaintiff's testimony. (Tr. at 37.) The hospital records, both from the emergency room and her physician, consistently reported that medical tests and examinations were unexceptional, and they did not confirm or find the cause of her pain. (Tr. at 35, 199, 200-01, 200-04, 207, 209-10, 224, 238-39, 259-60, 261, 264, 265, 268, 270-73, 287, 300, 310, 313, 315, 322-23, 326, 335, 338-39, 341-42, 344-47, 349, 421-22.) In March 2010, for example, the emergency room physician wrote, "At this time we do not have anything else as a source for her feeling this way." (Tr. at 342-43.) Her range of motion was not significantly restricted, she had steady gait, and her strength was normal. (Tr. at 239, 302, 326, 419.) Dr. Morse stated on August 25, 2010, that Plaintiff's right arm and both legs had normal range of motion and strength, and that she could "participate in exercise program[s]." (Tr. at 302.) Her strength in all extremities was normal again at the emergency room on October 21, 2010, even as she complained of acute lower back and leg pain. (Tr. at 419.) Many times her pain resolved rapidly at the emergency room or even before arriving there. (Tr. at 326, 340, 342, 349, 406, 421-22.) She also worked past the disability onset date, though not in substantial gainful employment. (Tr. at 48.) A few reports verified her complaints, but they do not prove more severe limitations than the ALJ found in the RFC. (Tr. at 228-30, 332.)

The ALJ adequately analyzed Dr. Morse's functional findings. (Tr. at 37.) The sheet he completed was a single page, pre-printed form, suggesting he did not labor to provide an accurate and nuanced assessment. (Tr. at 423.) The conclusions clashed with his own notes and objective evidence, which the ALJ summarized in detail in her decision. (Tr. at 35-37.) He also noted at various times that her impairments, such as hypertension, anxiety, and leg pain, were stable. (Tr. at 224, 287.) The ALJ's discussion addressed the nature of Plaintiff's relationship with Dr. Morse and showed that objective evidence did not support his conclusions. (*Id.*) This satisfies the regulations. 20 C.F.R. § 404.1527(c).

Her mental difficulties were largely built on subjective complaints. She cried at various times in the hospital. (Tr. at 342-43.) The ALJ also correctly noted that the casino trip reduces the persuasiveness of her testimony that she did not like to leave home or be around people. (Tr. at 36.) Dr. Brady's report is almost the only evidence lending any credence to her mental capacity claims, and that does not unequivocally state she is disabled, instead concluding that she would work slowly. (Tr. at 364.) The ALJ was evenhanded with this piece of evidence; she assigned it limited weight because he examined her only once and his conclusions relied heavily on her subjective complaints. (Tr. at 36.) His conclusions, which the ALJ did not wholly reject, appeared to simply reconvey many of Plaintiff's complaints: he reports in his conclusions that she is sad and uncomfortable around others, therefore he concludes her "ability to relate and interact with others . . . is marginal." (Tr. at 364.) The only areas his examination flagged, however, were her "ability to understand and complete tasks," which he did not think were "significantly impaired. (*Id.*) He thought she was cooperative and her thoughts organized, and he did not suggest she had

communication problems. (Tr. at 361-64.) His only basis for finding interpersonal problems was therefore her own complaints.

Other evidence supports the ALJ's conclusion regarding mental capacity. Dr. Morse frequently observed that Plaintiff's mood was not depressed, (Tr. at 225, 227, 302, 428), and Plaintiff told Dr. Morse on multiple visits that the medication helped. (Tr. at 226, 290.) Without any other evidence suggesting more significant mental limitations, the ALJ was correct to conclude that the mental impairments were not disabling. (Tr. at 34.) The RFC limits Plaintiff in the areas where Dr. Brady's actual examination found difficulties, and even credits her testimony that she did not like being around people. (Tr. at 34.) The evidence would not support any further restrictions.

The ALJ's RFC thus resulted from a proper and thorough analysis. It conceded that Plaintiff suffered pain but realistically found that the pain was not as severe as she claimed. The RFC nonetheless contained significant limitations. During the hearing, the ALJ included all of its restrictions in her hypothetical to the VE. (Tr. at 34, 59.) Consequently, I suggest that substantial evidence supports the ALJ's decision and that Defendant's motion should be granted, and Plaintiff's denied.

### 3. Conclusion

For all these reasons, after review of the record, I suggest that the decision of the ALJ, which ultimately became the final decision of the Commissioner, is within that "'zone of choice' within which decisionmakers may go either way without interference from the courts," *Felisky*, 35 F.3d at 1035 (quoting *Mullen*, 800 F.2d at 545), as the decision is supported by substantial evidence.

## III.  <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2). *See also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  October 31, 2014                    /S PATRICIA T. MORRIS
                                           Patricia T. Morris
                                           United States Magistrate Judge

## **CERTIFICATION**

    I hereby certify that this Report and Recommendation was electronically filed this date using the Court's CM/ECF system which delivers a copy to all counsel of record.

Date:  October 31, 2014            By      s/*Jean L. Broucek*
                                           Case Manager to Magistrate Judge Morris